Youssef H. Hammoud, CA Bar No. 321934
Email: yh@lawhammoud.com
**HAMMOUD LAW, P.C**
3744 East Chapman Avenue, #F12269
Orange, California 92859
Telephone: (949) 301-9692
Facsimile: (949) 301-9693
*Attorney for Plaintiff*
*Michael Evans*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## LOS ANGELES DIVISION

| | |
|---|---|
| MICHAEL EVANS,<br><br>    Plaintiff,<br><br>vs.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.,<br><br>    Defendants. | Case No.: 8:23-cv-00545<br><br>**JURY TRIAL DEMANDED** |

## **COMPLAINT**

Michael Evans ("Plaintiff" or "Mr. Evans") a living, breathing forty-four-year-old consumer, brings this action on an individual basis, against Experian Information Solutions, Inc. ("Experian" or "Defendant") and states as follows:

# __INTRODUCTION__

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant acknowledges this potential for misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.     These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.     Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.     One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as

> well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8.  The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.  In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S. C. § 1681(a)(4).

10. The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness

or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.    Plaintiff's claim arises out of Experian's blatantly inaccurate credit reporting, wherein Experian reported to Plaintiff's potential creditors that he is "deceased" under one of his tradelines.

12.    Accordingly, Plaintiff brings the claim against Experian for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

13.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Experian for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

**PARTIES**

14.    Michael Evans ("Plaintiff" or "Mr. Evans") is a natural person residing in Redondo Beach, Los Angeles County, California, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c) and Cal. Civ. Code § 1785.3(b).

15.    Defendant Experian Information Solutions, Inc. ("Defendant" or "Experian") is a corporation with a principal place of business located at 475 Anton

Blvd Costa Mesa, California 92626, and is authorized to do business in the State of California, including within this District.

16.    Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

19.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

20.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

21.    Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.  *See* 15 U.S.C. § 1681(b).

22.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

23.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**Defendant's Practices Concerning the Sale of Reports on the "Deceased"**

24.    The Defendant sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sells credit scores.

25.    Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Experian, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

26.    Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendant, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate 'permissible purposes."

27.    Defendant routinely places a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

28.    Defendant's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" or "U/UNDESIGNATED" code in the "ECOA" (Equal Credit Opportunity Act) field of an electronic data input format used in the credit reporting industry, known as Metro 2.

29.     Defendant does not request or require a death certificate from any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

30.     Defendant does not request or require any proof whatsoever from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

31.     Defendant does not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

32.     In some cases, in order to assure accuracy, the Defendant may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendant does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" or "U/UNDESIGNATED" deceased code is furnished to them to be placed in said consumer's credit file or report.

33.     Defendant regularly receives the "Death Master File" from the Social Security Administration, listing by Social Security number those consumers that

the government believes to be deceased. But Defendant does not cross-reference the "X", or "U/UNDESIGNATED" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

34.    Defendant will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

35.    Defendant fails to employ reasonable procedures that assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

36.    Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, the Defendant does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark in that consumer's file.

37.    Even in instances where the purportedly deceased consumer communicates directly with Defendant, Defendant does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is in fact actually deceased before placing the "deceased" mark on that consumer's report.

38.    Once a "deceased" mark is placed upon a consumer's report, the Defendant will not calculate and will not provide a credit score for that consumer.

39.    Upon Defendant's report with a "deceased" mark sold to third parties, the Defendant never calculates or provides a credit score for that consumer and instead reports that consumer's credit score as "N/A."

40.    Defendant knows that third party credit issuers require a credit score in order to process a given credit application.

41.    Defendant knows that consumers without credit scores are unable to secure any credit from most credit issuers.

42.    Defendant knows that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

43.    Defendant has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Defendant is inaccurately reporting them as "deceased" and without a credit score.

44.    Defendant has received and documented many disputes from consumers complaining that Defendant had erroneously marked them as "deceased" on their credit reports.

45.    Defendant knows that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" or "U/UNDESIGNATED" code, even when said consumers are not on the Death Master File and are in fact alive.

46.    Nevertheless, Defendant does not employ any procedures to assure that a consumer marked as "deceased" on their credit reports is in fact deceased.

47.    Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" or "U/UNDESIGNATED" code in the first instance decides to change the code.

48.    Defendant does not have any independent procedure to change an erroneous deceased status on its own and will merely parrot its furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

49.    Nor does Defendant employ any procedures to limit or stop the furnishing of reports to third parties for consumers that it has marked as "deceased" under any circumstances.

50.    For years after a consumer's actual death, Defendant will continue to sell credit reports about that consumer.

51.    Defendant will only remove a deceased consumer's file from its respective credit reporting databases when it is no longer valuable to it—meaning that no one is continuing to purchase reports about that consumer.

52.    Defendant charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

53.    Defendant profits from the sale of reports on deceased consumers.

54.    Defendant has in its respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that it has marked as "deceased."

55.    Defendant knows that truly deceased consumers do not apply for credit.

56.    Defendant knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendant to be a common and major source of identity theft.

57.    Defendant knows that identity theft and credit fraud are serious and widespread problems in our society.

58.    Defendant warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the

deceased and requires relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

59.    Defendant has no similar death certificate, executorship paper, or any other proof requirements for its data sources, which report a consumer as deceased or for the purchasers of its reports who access the purportedly deceased consumer's information.

60.    Defendant sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

61.    For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendant to sell their credit reports, absent a court order.

62.    Defendant knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Plaintiff Obtains His Credit Report and Identifies the Deceased Notation on His Credit Files**

63.    In or around September 2022, Plaintiff opened a checking account with JP Morgan Chase Bank. At the same time, he tried to apply for a business loan with JPMCB for his construction business but was denied.

64.    JP Morgan Chase Bank obtained Plaintiff's information from Experian.

65.    Plaintiff also had difficulty obtaining an apartment lease through Zillow Rentals in September and October 2022.

66.    Zillow Rentals obtained Plaintiff's information from Experian.

67.    At the end of December 2022, Plaintiff applied for a credit card with Ally Financial and an automobile loan with Sierra Autocar. However, both applications were denied.

68.    Both Sierra Autocar and Ally Financial obtained Plaintiff's credit file from Experian.

69.    Plaintiff then decided to obtain and review his credit reports from each credit reporting agency.

70.    Upon review of his January 25, 2023 Experian report obtained directly from www.annualcreditreport.com (Report Number 3333-0120-33), Plaintiff noticed that there was an inaccurate "deceased" notation on an account tradeline.

71.     Specifically, Experian reported Plaintiff as "deceased" ONLY on his First Bank mortgage account (the "Account") starting with 51360 and opened in June 2017.

72.     Plaintiff then reviewed previous consumer reports and realized that Experian had been reporting him with a deceased notation on each of them (only on the Account), going back to at least May 2022 (the oldest report he could access).

73.     Experian has reported Plaintiff as deceased since at least May 2022 although Experian was also reporting that Plaintiff was making timely payments on certain other accounts, including a child support payment that was "Open/Never late" with a last balance update of "12/31/2022" on his January 25, 2023 consumer report.

74.     Notably, neither Equifax nor Trans Union (who also reported Plaintiff's First Bank Account) ever reported Plaintiff as deceased.

75.     Plaintiff jointly opened the Account with his business partner. Upon information and belief, after his business partner died in 2021, First Bank reported to Experian that both Plaintiff and his business partner were deceased.

76.     Upon information and belief, First Bank also reported to Equifax and Trans Union that Plaintiff was deceased, but Equifax and Trans Union blocked that reporting as illogical.

77.    Upon information and belief, Experian never found Plaintiff listed in the Death Master File it regularly receives from the Social Security Administration but continued to report him as deceased; therefore Experian has actual knowledge that Plaintiff is alive.

78.    Defendant does not have a process to cross-check its "deceased" consumer reporting against the Death Master File.

79.    Upon information and belief, JPMorgan Chase Bank, Ally Financial, and Sierra Autocar denied Plaintiff's applications because of Experian's inaccurate reporting of a deceased notation on Plaintiff's credit file.

80.    A deceased person cannot obtain credit; a credit score will not be generated when a consumer report contains deceased notation.

81.    Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

82.    As a result of the "deceased" notation, Defendant made it practically impossible for Plaintiff to continue to obtain credit.

83.    Defendant is aware that under the FCRA, it is not allowed to report information that is "facially false," including information which is logically inconsistent, for example because no other furnishers reported Plaintiff as deceased and he was making timely payments on certain open accounts.

84.     The Consumer Financial Protection Bureau ("CFPB") published an advisory to highlight that a CRA "that does not implement reasonable internal controls to prevent the inclusion of facially false data, including logically inconsistent information, in consumer reports it prepares is not using reasonable procedures to assure maximum possible accuracy" under 1681e(b).[1]

85.     The CFPB specifically identifies as an example of logical inconsistencies: "Information about consumer accounts that is plainly inconsistent with other reported information, such that one piece of information must be inaccurate – for example, if every other tradeline is reporting ongoing payment activity, while one tradeline contains a "deceased" indicator, reasonable policies and procedures should identify the inconsistency and the consumer reporting agency should prevent the inclusion of the inaccurate information in consumer reports it generates." *Id.*

86.     The CFPB then cites to *Gohman v. Equifax Information Services, LLC*, 395 F.Supp. 2d 822, 827 (D.Minn. 2005) and *Sheffer v. Experian Information Solutions, Inc.,* 2003 WL 21710573, at *2 (E.D.Pa. 2003) (referencing the fact that only one account of approximately two dozen on a consumer's report included the

---

[1] *See* Fair Credit Reporting; Facially False Data, "The Bureau is issuing this advisory opinion to highlight that the legal requirement to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individuals about whom the reports relate includes, but is not limited to, procedures to screen for and eliminate logical inconsistencies to avoid including facially false data in consumer reports." https://files.consumerfinance.gov/f/documents/cfpb_fair-credit-reporting-facially-false-data_advisory-opinion_2022-10.pdf (last visited 03/24/23).

"deceased" notation as one of two "inconsistencies" that "provide[d] a basis from which a jury could infer that the procedures were unreasonable"). *Id*.

87.     At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Defendant herein.

88.     At all times pertinent hereto, the conduct of Defendant, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

89.     Defendant is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs.  Accordingly, Defendant's violations of the FCRA are willful.

90.     As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; detriment to his credit rating; the expenditure of time, money, and labor trying to correct inaccurate credit reporting; loss of sleep, headaches, and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

### CLAIMS FOR RELIEF
**COUNT I**
**15 U.S.C. § 1681e(b)**

**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

91.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

92.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

93.    On numerous occasions, Defendant Experian prepared patently false consumer reports concerning Plaintiff.

94.    Despite actual and implied knowledge that Plaintiff is not dead, Defendant readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

95.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

96.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; detriment to his credit rating; the expenditure of

time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

97.    Defendant's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

98.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

i.    Determining that Defendant negligently and/or willfully violated the FCRA;

ii.    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA, and;

iv.    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.


Dated: March 23, 2023

/s/ *Youssef Hammoud*
Youssef Hammoud, CA #321934
E: yh@lawhammoud.com
HAMMOUD LAW, P.C.
3744 E. Chapman Ave., #F12269
Orange, CA 92859
T: (949) 301-9692
F: (949) 301-9693
*Attorney for Plaintiff*
*Michael Evans*